EASTERN MOTOR EXPRESS, Inc.,
Plaintiff,

v.

A. MASCHMEIJER, Jr., Inc.,
Defendant.

United States District Court
S. D. New York.

Sept. 13, 1955.

Zelby & Burstein, New York City, Bernard Axler, New York City, of counsel, for plaintiff.

Jerome G. Greenspan, New York City, for defendant.

CONGER, District Judge.

This action was tried without a jury upon waiver of the parties in open court.

Plaintiff seeks judgment against defendant in the sum of $3,504.44[1] as a result of a certain occurrence which will be described hereafter.

There appears to be no substantial dispute of fact.

Plaintiff, an Indiana corporation, is, and was at the time of the carriage in suit, a common carrier by motor vehicle in interstate commerce.

Defendant, a New York corporation, is a manufacturer of, among other things, a chemical known as methyl phenyl acetate (hereinafter abbreviated to "m.p.a.") and maintains a plant in Newark, New Jersey.

On May 2, 1949, one George Kline, a driver then employed by Eastern, accompanied by one Edward T. McKaig, a helper, traveled in one of plaintiff's tractor-trailer units to defendant's plant where defendant's employees loaded on the trailer 30 drums of m.p.a. for shipment to Eli Lilly and Company, Indianapolis.

According to McKaig the drums were rolled up skids to the rear part of the trailer, whereupon he rolled them to the front, up-ended them, and placed them in horse-shoe fashion along the front and sides of the trailer. He inspected them as he performed this task and found no leaks. Thereafter he signed the bill of lading.

Kline did not participate in the loading of the drums although he observed the operation. He saw no leaks. Thereafter, he drove the truck-trailer to plaintiff's terminal in Jersey City, where miscellaneous freight of different consignors was loaded on the trailer. This freight was stowed on the floor up the center of the trailer by plaintiff's helpers, Caudito and Doerner, who saw no leakage from the drums.

Kline thereafter set out for Indianapolis. He passed through Harrisburg, Pa., having traveled to that point without incident, and continued along the Pennsylvania Turnpike to a truck stop known as Midway. There he slept, ate and showered, passing about 7 hours, and then resumed his journey. He stopped again at a place called Stanton on the Turnpike, where, immediately, and after having eaten, he detected moisture appearing on the underside of the trailer and a strange odor apparently emanating therefrom. Since the trailer had been sealed at Jersey City, he had no way of observing its interior to investigate the condition. He then called plaintiff's terminals at Pittsburgh and Indianapolis for permission to break the seal but could locate no one to authorize it. He thereupon broke the seal him-

---

[1] By stipulation incorporated in the pretrial order, the issue of damage has been reserved pending the determination of liability.

self, and upon inspection, found the floor damp with a liquid which had saturated the miscellaneous freight toward the back of the trailer. He detected a strong odor. He examined the drums and found one leaking. He moved some of the merchandise toward the front of the trailer, placing some on the drums, and continued his trip, stopping at Columbiana, Ohio, and Lodi, Ohio, where he contacted the Indianapolis dispatcher. He eventually reached the Indianapolis terminal, where he parked the trailer. The witness testified that he had no accident on the trip and no collision.

Thereafter, the trailer and its contents were inspected by Joseph Brown, head of plaintiff's claims department, and Frederick A. Atkinson, a chemist.

Mr. Brown inspected it on May 5, and found the odor from the trailer so offensive that he declined to enter it. He did see that the trailer floor was covered with a liquid and that shipping containers were stained. He also noticed that the underside of the trailer was devoid of paint.

Later that day, Brown saw the trailer again, along with Atkinson. He also inspected the tractor. Brown said the grease had been completely removed from the coupling wheel, and the paint had blistered off the saddle tanks. He removed part of the cargo and found some completely destroyed. He inspected two drums that had leaked their contents and found each had fractures, had been repainted and showed signs of rust. Two days later he obtained the drums from Eli Lilly and Company and put them in plaintiff's warehouse at Terre Haute, where they remained until 1951, when they were sent, crated, to Dr. B. F. Brown, a metallurgist, in Raleigh, N. C.

Atkinson, who inspected the drums on May 5, 1949, in company with Joseph Brown, testified through answers to interrogatories that m.p.a.'s great solvent power removes paint from practically all painted surfaces; that it has a strong, offensive odor and is extremely persistent; that it would injure shellac, destroy the insulating layers on television switches, connectors, condensors, etc., deteriorate binders on generator carbon brushes, remove paint from and penetrate a trailer floor and "bleed thru" any repainting, be absorbed by spices and destroy their flavor, among other things. He said that when he inspected the trailer, there was a pronounced odor in and about the trailer and the floor and the underparts were moist with m.p.a.

It was Atkinson's opinion that the trailer would be unusable until all the wooden parts had been replaced and the metal parts thoroughly cleaned and painted.

Dr. B. F. Brown, a metallurgist of undoubted quality, examined, at plaintiff's request, the two drums in Raleigh, N. C., in June, 1951. He stated that each drum was made from 18 gauge steel, had a 55 gallon capacity and that one was made in 1947 and the other in 1943. When he examined them the 1947 drum was rusty in the area of the bottom head and had a fracture in the bend of the chime circumferentially of the order of two inches. The chime he described as an extension of the side of the drum where it is crimped with the bottom or top head to form a seal and to act as a support in the case of the bottom head. The width of the fracture was not measurable in ordinary terms but might be described as a hairline fracture. He said the fracture in the 1943 drum was similar to that of the 1947 drum. He further observed loose red rust in the vicinity of the fracture of the 1947 drum but said that the 1943 drum was free of corrosion. He found that the center of the bottom head of the 1947 drum rested on the floor under load whereas this was not true of the 1943 drum. He said such a condition could result from one or a combination of the following: the basic properties of the steel, the contour of the bottom as determined by original design and reconditioning, severity of service since the last reconditioning, severity in time as well as in intensity.

Dr. Brown related that he examined under microscope small specimens of metal taken from the drums around the area of the fractures. These specimens had been prepared by standard techniques to reveal grain structure. Dr. Brown's testimony was so significant beyond this point that I set forth portions of it.

On direct examination:

"Q. On observation of the microscopic specimens and the photographs taken of those specimens, what in your opinion was the cause of the fracture? A. The fractures were caused by fatigue.

\*    \*    \*    \*    \*

"Q. In other words, Doctor, that lack of mechanical deformation indicates that the fracture or break occurred as a result of inherent failure of the metal itself caused by stress, is that what it shows? A. Coupled with the absence of the evidences of stress corrosion cracking, it indicates that again the failure is caused by fatigue.

"Q. Fatigue means metal fatigue? A. Yes.

\*    \*    \*    \*    \*

"Q. In your earlier testimony you mentioned reconditioning, what does that mean? A. Reconditioning is a practice for removing the dents which may have appeared in a drum, of cleaning the surface and of repainting it, generally. And in some instances of re-rolling the seam and the chime.

"Q. Will you describe some of the methods by which drums are occasionally reconditioned? A. Well, I do not believe there are standard practices, but at least some of the practices which are followed are these: a chain is tumbled inside the drum to remove rust, the drum will possibly be steamed to remove former ladings, the drum will be subjected to air pressure or to peening in order to remove dents, and as I said before, the chime may be rolled in order to raise the bottom so that the weight is held on the chime, and the drums may be painted in whole or in part.

\*    \*    \*    \*    \*

"Q. Would the tumbling of chains on the inside of a drum ever have the effect of adding stresses and strains to the metal? A. Probably not.

"Q. What ordinarily is the weakest portion of a metal drum, Doctor? A. By the nature of the stress system and the nature of the chime, the bend of the chime is usually the weakest point.

"Q. What would be the effect of rolling the bend of a chime on the metal itself? A. If the re-rolling were done in such a way that the contour at the bend becomes sharper, then it would tend to concentrate stresses there and accelerate failure by fatigue.

"Q. Doctor, when you examined these drums, did you notice any paint on the drums? A. Yes. There were four paint systems, four layers of paint evident in drum number two, and two paint systems in drum number one, on the bottom head.

"Q. That was the head which in each case had broken? A. The head that was fractured.

\*    \*    \*    \*    \*

"Q. Doctor, what causes metal fatigue with particular reference to drums? A. I might say parenthetically that the term metal in the metallurgical world is superfluous. In the literature it is simply fatigue. Fatigue is caused by an accumulation of damage to the metal as a result of repeated applications of stress above some limit in the case of steel.

"Q. The longer a drum is used the more likely it is to rupture or break? A. That is correct.

\*    \*    \*    \*    \*

"Q. Would you say that the breaks and fractures you examined in drums one and two were caused by a particular strain at the time that they fell? A. Would you like to state stress instead of strain?

"Q. Particular stress at the time they fell? A. No. In a fatigue fracture the fracture cannot be relayed to the stress at the time of fracture.

"Q. Does that mean, Doctor, that these breaks were not caused by any particular application of unusual force at the time the drums broke? A. That is correct.

"Q. Does that mean, Doctor, that these drums broke because they had been used so often and so hard, that they had been subjected to many previous stresses? A. That is correct.

"Q. Does that mean, doctor, that these drums just wore out? A. In a sense, yes.

"Q. Did the drums, did either of them show signs of any impact with any outside instrumentality at the point of the break? A. No.

"Q. Doctor, I ask you to assume that two 55 gallon drums were loaded in a plant of New Jersey by rolling them, together with others, up a skid, and that the drums were rolled on to the floor of a motor trailer, and that they were loaded so that they were resting on the bottom portion or bottom head of the drums. That from a plant in New Jersey they were moved to a freight terminal within 10 or 15 miles, that there additional freight was loaded onto the same trailer, and that from that point the drums were carried by automotive trailer to another point approximately 1,000 miles away, that the drums were transported in an ordinary fashion

"Mr. Greenspan: I object to the use of the word ordinary.

"Q. That the drums were transported without any untoward incident, and that in the course of the transportation they were discovered to have fractured. Now from your visual inspection, and the various microscopic tests and examinations to which you have subjected the drums, various coupons of the metal, metallurgical specimens, would you state what in your opinion was the cause of those fractures? A. Based upon such observations and tests and information, it is my opinion that the fractures were caused by an excessive number of applications of stress above the fatiguing limit on a material and a design, or on the material and the design.

"Q. Is the effect of your answer to say that these drums just wore out from usage? A. That is essentially correct."

On cross-examination:

"Q. In 1951, when you tested these drums, what satisfactory test or method was available to the ordinary user of the drum to detect fatigue damage in a drum? A. Before the fracture appears?

"Q. That is right. A. None.

"Q. Under ordinary inspection, would a visual inspection of the drum in 1949, reveal that the bottom head had deteriorated, of either one of these drums? A. It would not reveal that the metal had deteriorated.

\* \* \* \* \*

"Q. Now in 1951, when you tested these drums, what satisfactory test or method was available to you to detect fatigue damage in your laboratory? A. Microscopic examination of excised specimens.

"Q. Is that all? A. Plus the possibility of tensile and corrosion studies on the same metal.

\* \* \* \* \*

"Q. What would be the usual and ordinary tests which would re-

veal a deteriorated condition of the drum such as you have seen?

*    *    *    *    *

"A. Aside from corrosion, there is no feasible test to assess in a practical sense any damage which is stored up in a used drum.

"Q. As a matter of fact, isn't it also true that there is no known test that is known to the layman to determine whether a drum is suitable or not, if it is not new? A. Nothing other than his common sense if he sees gross dents, or other evidence of age or misuse.

*    *    *    *    *

"Q. Doctor, from an ordinary visual inspection of the bottoms of two drums, could anybody determine, and particularly the shipper in this case, that each was so weakened through continued re-use that transportation thereof created a risk, and would destroy or materially injure other merchandise, if it leaked? A. I can't answer it in the form.

"Q. Would the ordinary person using the drum; could a visual inspection of the bottom of the drum indicate that it was so weakened that it would leak in transportation? A. The best he could do would be to infer something from the age, that it is more hazardous than a new one. In the complete absence of corrosion and gross deformation.

*    *    *    *    *

"Q. Now Doctor, to paraphrase your testimony with respect to the condition of these drums, these drums actually sustained metal fatigue alone, and that caused these fractures, is that correct? A. The cause of the fracture was fatigue alone, yes. Again with that slight possibility that in number one corrosion may have contributed a little bit, although its contribution, if any, is small.

"Q. Didn't you say on your direct examination that there was no corrosion? A. That there was no stress corrosion cracking.

"Q. Well, it would be safe to say that the drum, the bottom of drum number one was caused by metal fatigue, or metal fatigue contributed by corrosion? A. Metal fatigue perhaps accelerated by corrosion.

"Q. Now are you able to tell whether the corrosion took effect? A. No, sir.

"Q. Are you able to determine whether in 1949 there was corrosion on the drum? A. No, sir.

"Q. I take it that your statement is prefaced on the remark that in 1951 you could not determine whether it had any rust on it in 1949. A. That's correct.

"Q. So that your statement with respect to 'metal fatigue perhaps accelerated by corrosion' is your conclusion of what you saw in 1951? A. Yes, sir.

"Q. And you do not know what position or condition the drum was in between 1949 and 1951? A. That is correct."

On redirect examination:

"Q. Dr. Brown, your last answer relates solely to corrosion does it not? A. Yes. The point is this; the corrosion does not affect the appearance of the grain structure back from the surface. Although the corrosion may have assisted in the original propagation of the fracture, it still has to be a fatigue mechanism because the grain structure which is essentially inalterable, shows that.

"Mr. Greenspan: Were you able in 1951 to determine when the corrosion effects contributed to the fracture by metal fatigue?

"Mr. Axler: If they did.

"The Witness: No, sir, I could not even say that they did. There is the possibility based on the rust. But still the structure which is in-

alterable indicates that the basic mechanism is still fatigue.

\*    \*    \*    \*    \*

"Q. In other words, Doctor, if a shipper of any commodity which is ordinarily shipped in drums were to know the previous history of a drum, its usage in miles, and the amount or weight of the thing with which it was loaded, would he then be in a better position to determine whether or not the use of a particular container at a particular time was hazardous or was more likely to fracture because of metal fatigue than if he did not know the previous history of the drum? A. Yes.

"Q. In other words, Doctor, is it a fact that a shipper who uses his drums acquired from many sources without knowing the history of those drums, is assuming a greater risk than a shipper of a commodity who knows the previous history of a container?

\*    \*    \*    \*    \*

"A. And acts upon it, yes.

"Q. From your experience, Doctor, in this field, would you say that there is a direct relationship between the life of a drum and the usage to which it is subjected? A. Yes.

"Q. In other words, the longer one uses a drum, the more stress is accumulated in the metal of the container, is that correct? A. The more damage, let us say.

\*    \*    \*    \*    \*

"Q. Is it not a fact that a drum which has been subjected to use is more likely to fracture or break than a new drum would under identical conditions? A. Yes.

"Q. Is it a fact, Doctor, that a drum with a re-rolled chime is more likely to fracture than a new drum under identical conditions? A. Yes."

The amended complaint sets forth two claims for relief.

The crux of the first is set forth in paragraph 6 as follows:

"6. The leakage of the methyl phenyl acetate delivered by defendant to plaintiff for interstate motor transportation on May 2, 1949, and the resulting damage to property hereinafter specified, was solely and proximately caused by each and all of the following acts or omissions of defendant, namely:

"(a) Defendant negligently delivered said drums containing said methyl phenyl acetate to plaintiff for interstate motor transportation since it knew, or in the exercise of reasonable care should have known, that the metal bottoms of at least two of said drums had become weakened through continuous reuse and did not have sufficient tensile strength to contain without leakage said liquid chemical during the ordinary incidents of handling and transportation.

"(b) Defendant negligently delivered to plaintiff for interstate motor transportation with other freight said drums containing said methyl phenyl acetate since it knew, or in the exercise of reasonable care should have known, that the bottoms of at least two of said drums had become so weakened through continuous reuse that said transportation thereof created a risk that said methyl phenyl acetate would leak out from said two weakened drums and materially injure or destroy said other freight and plaintiff's trailer.

"(c) Defendant negligently failed to pack said methyl phenyl acetate in containers strong enough to stand, without rupture or leakage of contents, all shocks ordinarily incident to handling during their transit by highway from the State of New York to the State of Indiana.

"(d) Defendant negligently failed to pack said methyl phenyl acetate in containers that were in such condi-

tion that they would protect their contents during their transit from the State of New York to the State of Indiana as safely as new containers.

"(e) Defendant negligently failed to repair in an efficient manner the said two drums, the bottoms of which broke during said transit before shipping methyl phenyl acetate by highway from the State of New York to the State of Indiana.

"(f) Defendant negligently failed to replace the weak and otherwise deteriorated bottoms of the two drums, the bottoms of which broke during said transit before shipping methyl phenyl acetate therein by highway from the State of New York to the State of Indiana.

"(g) Defendant negligently filled the two said drums, the bottoms of which broke during said transit entirely with said methyl phenyl acetate.

"(h) Defendant negligently failed to leave vacant sufficient interior space in the two said drums, the bottoms of which broke during said transit to prevent leakage therefrom of said methyl phenyl acetate due to the expansion thereof from increase of temperature during transit.

"(i) Defendant negligently failed to warn plaintiff that the contents of the said drums delivered to plaintiff by defendant for transportation was a substance possessing dangerous, destructive and corrosive qualities, capable of impregnating other substances with a highly obnoxious odor and of dissolving other substances, such as paint.

"(j) Defendant negligently represented to plaintiff that the said drums delivered to plaintiff for transportation contained harmless chemicals and negligently certified that said drums had been properly packed and were in proper condition

for transportation according to the regulations prescribed by the Interstate Commerce Commission."

Paragraphs 10 to 14 set forth the second claim as follows:

"10. That concurrently with the delivery by defendant of the said thirty (30) steel drums containing the methyl phenyl acetate for transportation, the defendant warranted expressly in a bill of lading simultaneously executed and delivered, that the said commodity was packed in accordance with the rules and regulations made and provided by the Interstate Commerce Commission relating to the shipment of said commodities or of like commodities.

"11. That said warranty was false and untrue.

"12. That in accepting said commodity for shipment, packed as aforesaid, the plaintiff relied upon the truth of said warranty and representation, to its damage as aforesaid.

"13. That the delivery of the said methyl phenyl acetate to the plaintiff by the defendant on or about the 2nd day of May, 1949 constituted a warranty, implied in law and in fact, that the said chemical was packed in a safe and proper fashion and that the containers in which the chemical was packed were in good and serviceable condition, and were sufficient to withstand, without harm, damage or leakage, the normal hazards and incidents of transportation.

"14. That in truth and in fact, the said containers, or some of them, were not in the said condition and were unable to withstand the normal hazards and incidents of transportation and did, in fact, without fault upon the part of the plaintiff, leak and open and permit the chemical contained therein to leave the container, all to the damage of the plaintiff as aforesaid."

At the close of plaintiff's case defendant moved to dismiss both claims and I reserved decision.

I shall take up the first claim with reference to the so-called specifications alleged in paragraph 6 of the amended complaint.

Specifications 6(a) and 6(b) are cumulative in effect and charge generally that defendant knew or in the exercise of reasonable care should have known that the bottoms had become weakened through re-use.

Aside from the facts that one drum was two years old and the other six, there is no proof that defendant "knew" the drums had become weakened from re-use. Although it might be presumed that almost anything becomes weakened through re-use, there was no evidence to show at what point re-use of drums constitutes dereliction.

Further, since Dr. Brown stated that the cause of the fractures was metal fatigue and that the method he used was the only method for discovering the same, it would be ridiculous to suppose that "reasonable care" obligated defendant to excise specimens from its drums in order to prevent occurrences similar to those in suit. Such an obligation carried to its logical extreme would require destruction of the drums to ascertain their life expectancy.

With regard to specification 6(c), it is sufficient to say that there was no evidence of containers stronger than those used, so defendant may not be said to have been negligent in using the containers in suit.

Specification 6(d) is completely innocuous in the absence of proof, of which there was none, that m.p.a. is properly contained only in new drums.

With respect to specifications 6(e) and 6(f), there was no proof that the drums were in need of repair or weakened or otherwise deteriorated prior to shipment.

As for specifications 6(g) and 6(h), there was no proof that defendant filled the drums "entirely" nor that this was improper treatment of m.p.a. assuming it were so.

As for specification 6(i), the properties attributed to m.p.a. in this specification were supported by Atkinson except for "dangerous". Although "dangerous" is a word of many connotations, I take it here to be a generic synonym of the attributes Atkinson described. Assuming, therefore, that defendant was obliged to warn plaintiff of the properties of m.p.a. and further assuming that the description on the bill of lading—"30 Drums Methyl Phenal Acetate"—was not such warning, I fail to find any semblance of proof from any of plaintiff's witnesses or exhibits that defendant did not warn them of the nature of the substance contained in the drums. There remains no more than the bare allegation unsupported by even a reference to the claim in plaintiff's proof.

Specification 6(j) rests solely on the bill of lading which was supplied by defendant. Printed thereon was, among other things, the legend, "Harmless Chemicals", and the statement "This is to certify that the above articles are properly described by name and are packed and marked and are in proper condition for transportation according to the regulations prescribed by the Interstate Commerce Commission". Although defendant's name is printed at the bottom of the document, it was signed by plaintiff's helper, McKaig, who stamped plaintiff's name and his own thereon and initialed it.

The only possible evidence to support specification 6(j) must be found in McKaig's testimony. He stated simply that he assisted in the loading to the extent previously described and then signed the bill of lading; so that the alleged negligent representation and certification were made to plaintiff when McKaig observed and signed the bill of lading after the loading had been completed.

■ Neither party has understood the efficacy of citing New Jersey law in their memoranda on any part of the case

**486**

even though it controls much of the transaction. Nevertheless, it is everywhere recognized that careless words are actionable only where a party moves in reliance upon the words. See Restatement of Torts, § 310 et seq.; 65 C.J.S., Negligence, § 20; cf. Economy Bldg. & Loan Ass'n v. West Jersey Title Co., 64 N.J.L. 27, 44 A. 854. There is nothing in plaintiff's case indicating in the slightest that the words of the bill of lading formed any significant part in plaintiff's determination to carry the load. Therefore, ignoring the question of whether the representation and certification were in fact untrue and the significance of defendant's failure to sign the bill of lading, I hold that plaintiff has failed to prove 6(j).

■ I further find that, aside from the specifications, plaintiff has made no case for recovery against defendant on any theory of negligence.

Defendant's motion to dismiss the first claim at the close of plaintiff's case is granted.

It is to be noted that the second claim relies upon two so-called warranties.

The first alleged warranty, said to be express, is based upon the language at the foot of the bill of lading—"This is to certify that the above articles * * * are in proper condition for transportation according to the regulations prescribed by the Interstate Commerce Commission."

It is said that this was false and that plaintiff relied upon it in accepting the shipment.

It is stipulated that the shipment was subject to, among other tariffs, tariff MF-ICC No. 17, National Motor Freight Classification No. 9 and supplements thereto. Rule 5, subsection 8(a) of such tariff provides as follows:

"Barrels * * * drums * * * must be made of wood * * *

metal * * * or other materials of such strength as to afford safe handling, reasonable and proper protection of contents and to protect against damage to other goods."

And subsection 8(h) of Rule 5 provides:

"Drums are straight-sides shipping containers of five gallons capacity or over, but not exceeding 165 gallons capacity, without bilge, with ends or heads of equal diameter, with or without bails or handles, and must be made of wood, fibreboard or metal."

■ The only evidence that the drums were not "in proper condition for transportation according to the regulations" is that they fractured and leaked. But the regulations do not require a drum that shall never leak; merely one affording *reasonable* protecton, etc. There is no doubt the drums complied with the regulation, for otherwise the carrier might have rejected the shipment, Rule 5(b) of Tariff, supra, and/or excepted to the clean bill of lading.

Therefore, plaintiff has not convinced me that the certificate was false.

■ Beyond this, assuming that the certificate was false, I find an obvious impediment to recovery on this ground. And that is that plaintiff could not have relied upon the certificate in accepting the shipment. Mr. Brown, of plaintiff's claim department, conceded that the certificate is required for, and is applicable to explosives and dangerous articles (MF-ICC No. 16–Motor Carriers Explosives and Dangerous Articles Tariff No. 5) and that m.p.a. is not in those categories. Since plaintiff is a party to the tariffs, it cannot be said to have relied on a certification which it knows to be inapplicable.[2]

The second alleged warranty is said to be implied.

2. It is significant that plaintiff ignores Section 6 of the terms of the bill of lading reading as follows: "Every party, whether principal or agent, shipping explosives or dangerous goods, without previous full written disclosure to the carrier of their nature, shall be liable for and indemnify the carrier against all loss or damage caused by such goods and such goods may be warehoused at owner's risk and expense or destroyed without compensation."

The bill of lading provides in pertinent part as follows:

"Sec. 1(a) The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided.

"(b) No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, the authority of law, or the act or default of the shipper or owner, or for natural shrinkage. * * *"

■ At common law, common carriers were liable for all loss or injury not due to the act of God or public enemy, the inherent nature of the goods, or the act or fault of the shipper. 13 C.J.S., Carriers, § 71; Commodity Credit Corp. v. Norton, 3 Cir., 167 F.2d 161.

So that in effect the bill of lading incorporated the common law; and the carrier may exonerate itself solely through an excepted clause, which, to my knowledge, never included the so-called implied warranty advanced by plaintiff.

■ Of course the foregoing is not applicable to damage occurring to plaintiff's truck-trailer by reason of the leakage. Aside from the question of whether any warranty remains to be implied in view of the express representations in the bill of lading, I fail to find any basis for the implication that containers shall never leak in carriage.[3] Were this so, carriage would be at the peril of the shipper for the carrier has sole control of the goods during shipment.

Defendant's motion to dismiss the second claim is granted.

Although the foregoing disposes of the entire case, I believe I should consider defendant's proof so that the Court of Appeals, in the event of an appeal, shall have the benefit of my findings.

One Norman Lindsay, an employee of defendant in charge of the manufacture of m.p.a., said on direct examination that it was useful for making penicillin, for flavoring and perfumes, among other uses. He said that defendant has considerable spillage of m.p.a., but that it is wiped up and its odor disappears shortly. He said it would remove paint. Lindsay was not cross-examined.

Russell R. King, who was a shipping clerk employed by defendant in 1949, testified on direct examination that before a drum was filled with m.p.a. he inspected it. On reconditioned drums he used a flashlight to inspect the insides by peering through the bung holes; he poured a solvent into the drums and rolled them around for leakage; he went over the outside of the drums; they were then left in the shipping room for a week or two. He saw no leaks in any of the drums used in this shipment at the time they were filled and loaded; he assisted in the loading, which comprised rolling the drums up a skid to the rear of the trailer; he was shown pictures taken in April, 1951 of the two drums that fractured and identified them as depicting defendant's drums but said they were not in such condition—the pictures indicating several dents—when shipped; that it would not be good practice to use drums in such condition.

On cross-examination, he said that he had no recollection of the number of drums that were new or reconditioned; he kept no record of the number of times a drum was used but said re-use depended upon the condition of the drums. He repeated his practice of inspection, adding thereto the use of an air hose; he did not x-ray the drums. He said that he would not use a drum whose bottom head contacted the surface.

Fred Kossach, assistant superintendent of defendant, assisted in the loading of the drums. He said that defendant's men not only rolled the drums up skids to the rear of the trailer, but fur-

---

3. I except dangerous articles from this.

ther arranged them in the trailer lying down on their side, a piece of wood in between to keep them from rolling. Actually, this testimony varies with that of McKaig but I put no significance in the point. He saw no leaks and said the drums were not in the condition shown in the pictures at the time they were loaded; that the years stamped on the drums were 1947 and 1948; that the drums were inspected for a week after being filled and prior to loading.

One Hyman Katz, called by defendant as an expert on traffic and transportation, sought to support defendant's contention that defendant was entitled to exclusive use of the vehicle.[4] Mr. Katz expressed the opinion that the shipment involved such exclusive use but my reading of the tariffs, upon which Mr. Katz based his opinion, plainly does not confirm this notion.

Defendant paid the truckload rate of 95 cents per hundred pounds based upon a minimum of 25,000 pounds. MF-ICC No. A-41, Supp. 12, Item 5120-H of E.C. M.C.A. and MF-ICC No. A-43, List 80 of 14-F of E.C.M.C.A. Exceptions. This amounted to $237.50 plus tax.

The exclusive use rate for the shipment, as related by Mr. Katz, would have been $1.66 per hundred pounds, amounting to $259.32 plus tax.

I got the impression from Mr. Katz that defendant had saved money on the shipment by a judicious application of the tariffs. In its memorandum, defendant now says that Mr. Katz's testimony was confusing in this respect and that in fact a charge for exclusive use could never exceed charges based upon the truckload minimum weight rate.

Whether or not this is so, it is clear that defendant did not pay for exclusive use; and it did not request exclusive use nor was the bill of lading so marked as required by the tariff MC-ICC No. A-43, Item 1530-C of Supp. 8, E.C.M.C.A. Exceptions 14-F.

I would conclude, therefore, that defendant was not entitled to exclusive use and would so hold if necessary.

In addition to defendant's arguments previously considered, there are the additional contentions that (1) plaintiff was negligent in failing to brace and block the drums for carriage; and (2) plaintiff's payment of Eli Lilly's loss was an estoppel to a claim against defendant.

In view of my disposition, I need not decide (2). As for (1), I find that defendant has failed to prove that it was negligent not to brace and block the drums.

This opinion shall constitute my findings of fact and conclusions of law.

Settle judgment in accordance with the foregoing.

---

4. From this defendant argues that it could not be liable for damage to articles which plaintiff carried in violation of defendant's exclusive use privilege.